**UNITED STATES of America,
Appellant,**

v.

**Francisco ARTIERI and Hiram Reyes
Gonzales, Appellees.**

**No. 196, Docket 73–1771.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 11, 1973.

Decided Jan. 23, 1974.

Robert B. Cohen, Hartford, Conn., for appellee Gonzales.

Igor I. Sikorsky, Jr., Hartford, Conn., for appellee Artieri.

Randolph C. Roeder, Asst. U. S. Atty., District of Connecticut (Stewart H. Jones, U. S. Atty., District of Connecticut, on the brief), for appellant.

Before FRIENDLY, ANDERSON and MULLIGAN, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

On the night of September 12, 1972, one Gregouir Bosques informed Detective Paul Slyman of the Willimantic, Connecticut, Police Department that the defendant Francisco Artieri, whom Slyman knew to be a "big heroin dealer in Willimantic," had asked him to help "cut and bag" heroin the following day; but Bosques said he did not know when or where the operation would occur. At about 11:00 p. m. Slyman relayed this information to Special Agent Joseph Keefe of the Federal Bureau of Narcotics and Dangerous Drugs. The next morning at 8:30, Keefe went to the home of Bosques, who then told him that Artieri and defendant Hiram Reyes Gonzales planned to divide a quantity of heroin at Gonzales' dwelling sometime that day. Bosques told the agent that

Gonzales did not keep heroin in his apartment and that he did not know when it would be delivered there.

The arrangements called for Bosques to meet Artieri before going to Gonzales' residence. He arrived at Artieri's home at 9:15, but found that Artieri was sleeping, and Bosques waited outside until Artieri appeared. Six agents and Slyman also waited, not knowing from moment to moment when Artieri might awaken, but standing ready to follow him when he did. Artieri came out at 10:30 and Bosques drove him to Gonzales' home. The agents followed and continued their surveillance there. At 10:40, shortly after Bosques and Artieri, followed by the agents, had arrived, Gonzales drove up, and accompanied by Bosques and Artieri, went into his house, which was a three-floor apartment unit.

At 11:50, the informer gave the agents a prearranged signal indicating that heroin was being cut and bagged. Three of the federal agents immediately approached the front door. Special Agent O'Brien knocked loudly, and while the door, which was not latched, swung open, he shouted that they were federal agents; they paused for about three seconds and then entered. Keefe and Slyman, and the remaining two agents sought to gain entrance through the rear door but found it locked. There was evidence that Artieri was known to carry a gun and at least two of the agents, therefore, had their guns drawn.

None of the agents knew where in the house the defendants were, and two of them went upstairs, looking for them. Special Agent Sloboda, who had remained on the first floor, found them cutting heroin at the kitchen table. He placed them under arrest and opened the back-door for the agents waiting there. The other two agents had already joined him. Approximately 169.7 grams of heroin and paraphernalia were seized from the table. After the arrests, the upstairs rooms, their closets, bureau drawers and mattresses were searched. Some of the officers also searched the basement and found and seized some additional contraband there.

On February 5, 13, and 14, 1973, the district court held a hearing on a defense motion to suppress the evidence of the 169.7 grams of heroin seized from the table at the time of arrest. In reliance on Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, reh. den., 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971), the court excluded the evidence as the product of a planned, warrantless search in violation of the Fourth Amendment.

Because "the evidence is a substantial proof of a fact material in the proceeding" the United States has appealed under 18 U.S.C. § 3731 and contends that no warrant was required.

The trial court, at the time of its ruling did not have available the opinion of this court, decided October 1, 1973, in United States v. Santana, 485 F.2d 365, 369–370 and n. 8 (2 Cir. 1973), which commented on the reach of Coolidge; nor did it have the very recent decisions of the Supreme Court in United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) and Gustafson v. State of Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456, 1973, which relate to seizures incidental to arrests. We are of the opinion that the trial court's conclusion that this was a planned warrantless search was a misinterpretation of the events.

The Court in Coolidge limited the scope of a warrantless search at the scene of an arrest but explicitly refrained from requiring a warrant for a search incidental to an arrest, 403 U.S. at 482, 91 S.Ct. 2022. Two separate opinions warned against imposing such a limitation. Id., at 509, 91 S.Ct. 2022 (Black, J.), and at 519, 91 S.Ct. 2022 (White, J.). It is this view that has recently been reaffirmed in United States v. Robinson, supra. Instead of being concerned with incidental searches the plurality's discussion (section IIC) was directed against the proposition that an unlimited "plain view" exception should

be recognized as a co-equal justification for seizure along with action taken pursuant to a search warrant or a seizure made incidental to an arrest. It said, "This Court has never permitted the legitimation of a *planned* warrantless seizure on plain-view grounds. . . ." 403 U.S. at 471, n. 27, 91 S.Ct. at 2041. (Emphasis in the original text.) *"Coolidge* teaches that where the police have ample opportunity to obtain a search warrant and the intention to seize the evidence is really the prime motivation for the arrest, the plain view exception does not apply." United States v. Lisznyai, 470 F.2d 707, 710 (2 Cir. 1972), cert. den., 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973). See also United States v. Santana, *supra*.

■ Although in the present case the narcotics were openly on the table, the plain view exception was not the basis for the seizure nor was any attempt made to claim that it was. The purpose of the entry was to arrest those whom the agents had probable cause to believe were in illegal possession of narcotics. The seizure was amply justified by the fact that the contraband was right in front of the defendants, and within their easy reach. It was plainly accessible to them and under their immediate control at the moment they were placed under arrest. United States v. Robinson, *supra*; Gustafson v. State of Florida, *supra*; Chimel v. California, 395 U. S. 752 at 763, 89 S.Ct. 2034, 23 L.Ed.2d 685.

In *Robinson* the Court said, "it is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment", 414 U.S. 218, at 224, 94 S.Ct. 467, at 471, and that the exception covers "the area within the control of the arrestee."

The district court based its conclusions on the assumption that "the prime motivation for the initial intrusion into the defendant's [Gonzales'] apartment and the arrest was the seizure of the heroin . . . ." But the initial effort upon entry was to locate the defendants, and the record points to the apprehension of Artieri (the big heroin dealer in Willimantic) and those operating with him as the prime motivation. The evidence sought to be suppressed in this proceeding consisted only of the 169.7 grams of heroin and accompanying paraphernalia taken from the table and from the immediate possession and control of the defendants as incidental to the arrest.

We now turn to the entry issue. The defendants-appellees make the claim that the entry by the agents into Gonzales' apartment violated their Fourth Amendment rights and those under 18 U.S.C. § 3109, because the agents did not announce their purpose, at the time they knocked and identified themselves, or pause long enough to permit the suspects to refuse admittance. This issue was raised at the hearing in the district court, but that court suppressed the evidence because no warrant had been obtained, and it never reached the question. The record, however, shows that the circumstances of the entry into the apartment were fully gone into by the parties; and, if we accept the evidence presented by the defendants as the story of the entry and compare it with that offered by the Government, it is apparent that there is no material issue of fact in the case, insofar as the circumstances of the entry are concerned. It may also be noted that the defense testimony disclosed that the agents and police had reasonable grounds to believe that it was likely that defendant Artieri, but not the defendant Gonzales, was armed. Under these circumstances we see no need to remand the proceedings for findings by the trial court. The facts concerning the entry by the agents and police into Gonzales' apartment are those stated heretofore in this opinion.

■ 18 U.S.C. § 3109 provides as follows:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything

## 444

therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." [1]

■ The Supreme Court in the case of Miller v. United States, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), held, in effect, that the provisions of § 3109 applied not only to cases in which a warrant had been issued, but to those as well, which rested on probable cause alone. See Sabbath v. United States, 391 U.S. 585, 588, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). Then in Ker v. California, 374 U.S. 23, 48, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), the Court, both the majority and minority, made it clear that the criteria set out in § 3109 did not in all cases have to be literally fulfilled or carried out to constitute an entry which did not violate the Fourth Amendment, or, for that matter, contravene the statute itself. They disagreed on what exceptions should be recognized. The minority, enunciating the stricter standards, described them in terms of three particular situations, the first of them being, "(1) where the persons within already know of the officers' authority and purpose."

This and the other two exceptions were later adopted by reference by a majority of the Court in its opinion in Sabbath v. United States, *supra*, which expressly held that these limited exceptions also applied to § 3109. The first exception is recited in full because it is the only one applicable to the present case.

The forcible entry of narcotics agents into a private apartment was the subject of an en banc decision by this court in an opinion which thoroughly discussed the statute, § 3109, and the cases which

had a bearing on its application. United States v. Manning, 2 Cir., 448 F.2d 992 at 997–1002. In commenting on the question whether or not the defendant, Manning, who was inside of the apartment entered by the police (as Artieri and Gonzales were in the present case), could be said to be "[a person] within [who] already [knew] of the officers' authority and purpose" the court said:

"... when an officer knocks on the door of an apartment occupied by an experienced narcotics violator, which is reasonably believed by him to be so, and clearly identifies himself as a Federal agent, there is sufficient compliance with the spirit of the statute even if perhaps not with the strict letter. A knock is at least a request for entry, and a trafficker in narcotics who has been told that this is being made by a Federal agent can have no real doubt that the purpose is arrest, search, or both, or that, if the request is not honored, something more will speedily follow. ..." 448 F.2d 1000–1001.

This aptly describes the officers' conduct in this case and brings the entry within the first exception. It therefore violated neither the Fourth Amendment nor the statute. Sabbath v. United States, 391 U.S. at 591, 88 S.Ct. 1755, 20 L.Ed.2d 828.

In addition, the agents making the entry had reasonable grounds to believe and did believe that the defendant Artieri was likely to be armed. They were, therefore, faced with an exigent situation, and it was unnecessary for them to announce their purpose in making the entry and to pause to enable the defendants to refuse admittance. *Sabbath, supra* at 591, 88 S.Ct. 1755. Neither the Fourth Amendment rights nor the § 3109 statutory rights of either of the

---

1. The so-called no-knock statute, 21 U.S.C. § 879, which has to do with making entry in narcotics cases, was enacted in 1970 and became effective October 27, 1970. This court has held that it is inapplicable to cases in which no special warrant, described in the statute itself, has been obtained. United States v. Mapp, 476 F.2d 67, 75, n. 11 (2 Cir. 1973).

defendants were so violated through any of the circumstances attending the entry by the officers into the apartment, as to require the suppression of the seized evidence.

One phase of this case remains which requires discussion and that concerns the search of the upstairs rooms and the basement by some of the officers, following the arrest of the defendants and the seizure of the heroin and paraphernalia from the kitchen table. All of the rooms on the second floor, the closets, bureau drawers and mattresses were thoroughly searched. No contraband was found and no property was seized. A search of the basement, however, disclosed some contraband which was seized, but it was never offered in evidence and is not a subject of the suppression order.

■ There is no doubt that these second floor and basement searches were unauthorized, unlawful, and in direct contravention of the Fourth Amendment rights of the defendant Gonzales. They were made after the arrest of the defendants and the seizure of the heroin and equipment and after the second floor had been examined for possible confederates of the defendants. They were made for the sole purpose of discovering narcotics. They exceeded in scope what was defined in *Chimel* as permissible bounds, justified as incident to an arrest; and they came within no "well-recognized exceptions," 395 U.S. at 703, 89 S.Ct. 2034. In brief, it was the kind of general exploratory search through a private dwelling and its fixtures and furnishings which the Fourth Amendment was primarily designed to prevent. United States v. United States District Court, 407 U.S. 297, 326–327, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (Douglas, *J.* concurring); Von Cleef v. New Jersey, 395 U.S. 814, 816, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969); Lewis v. United States, 385 U.S. 206, 211, 87 S. Ct. 424, 17 L.Ed.2d 312 (1966); United States v. Rabinowitz, 339 U.S. 56 at 62,

70 S.Ct. 430; Marron v. United States, 275 U.S. 192, 195, 48 S.Ct. 74, 72 L.Ed. 231 (1927). The prosecution recognized the constitutional infirmities of these searches and refrained from offering in evidence the contraband discovered in the basement.

■ The question arises whether or not the exclusionary sanction should be imposed upon the lawfully seized evidence because of subsequent wrongful behavior by over-zealous enforcement officials in making an unlawful search, even though the prosecutor had wisely elected to withhold from evidence the fruits of that unlawful search.

It may be argued that, although the exclusionary rule, Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L. Ed. 652 (1914); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), could not sensibly or effectively be invoked against the contraband seized in the basement, which was never offered in evidence, the rule ought to be extended to exclude the evidence lawfully seized from the defendants at the kitchen table on the ground that the police officials making the lawful seizure were in the same group of police officials and engaged in the same case or investigation with those who made the unlawful search. This would, indeed, be a radical extension of the exclusionary rule. In the first place, evidence lawfully seized as incidental to an arrest is not transmuted into an unlawful seizure by a subsequent unconstitutional seizure made in the same case. In United States v. Holmes, 452 F.2d 249, 259 (7 Cir. 1971), a Government agent lawfully seized a telephone book, containing an inculpatory list of telephone numbers, incidentally with the arrest of Holmes. Thereafter the bedrooms and other parts of Holmes' house were unlawfully searched and several items were seized. He claimed that, even though the telephone book was the only material placed in evidence, it was inadmissible because of the unlawful scope of the later

search. The court held, however, that even if reasonable limits were exceeded in the subsequent search, the seizure of the telephone book, which was within proper limits, would not "thereby be retroactively rendered inadmissible." See also United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927), in which the Court said, at p. 563, 47 S.Ct. at p. 748, "A later trespass by the officers, if any, did not render inadmissible in evidence knowledge legally obtained."

Moreover, there has been, particularly in the past decade, a growing disillusionment with the effectiveness and usefulness of the exclusionary rule. The best known and most trenchantly succinct criticism, which lays bare its primary weakness, is, of course, Judge Cardozo's statement in People v. Defore, 242 N.Y. 113, 150 N.E. 585, 587 (1926), "The criminal is to go free because the constable has blundered." The Supreme Court has declined to extend its operation to evidence presented to grand juries. United States v. Calandra, 414 U. S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

Chief Justice Burger, in his dissenting opinion in Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 411–427, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), has fully and forcefully presented the history and present low estate of the rule and has carefully catalogued the comments of leading legal scholars on the subject. He said at p. 418, 91 S.Ct. at p. 2015,

"Suppressing unchallenged truth has set guilty criminals free but demonstrably has neither deterred deliberate violations of the Fourth Amendment nor decreased those errors in judgment that will inevitably occur given the pressures inherent in police work having to do with serious crimes."

and again at page 420, 91 S.Ct. at p. 2017,

"But in the same spirit we should be prepared to discontinue what the experience of over half a century has shown neither deters errant officers nor affords a remedy to the totally innocent victims of official misconduct."

For us to extend the application of the exclusionary rule to suppress lawfully acquired evidence to punish enforcement officers who later unlawfully seized additional evidentiary material which the Government voluntarily suppressed, would be making a bad situation infinitely worse. We, therefore, decline so to rule.

". . . [W]e are not convinced that the additional benefits of extending the exclusionary rule . . . would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." Alderman v. United States, 394 U.S. 165, 174–175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969).

■■■ This is not to say that a defendant whose Fourth Amendment rights have been violated should have no remedy.[2] Victims of illegal searches can

---

2. The dissent by Chief Justice Burger in Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L. Ed.2d 619 (1971), was based upon his conclusion that the creation of an effective substitute for the exclusionary rule was a task which should be dealt with by the Congress rather than by the courts; and in implementation of this he takes the position that the victim of an improper search or seizure should be able to sue the Government and that the sovereign's immunity should be waived in this regard. 403 U.S. at 423–424, 91 S.Ct. 1999. Several members of the Congress have agreed. Individual Views of Sen. Charles H. Percy, Report of the Committee on Governmental Operations, S.Rep. No. 93–469, 93rd Congress, 1st Sess., pp. 29, 35 (1973).

Whether any kind of action arising out of a Fourth Amendment violation can now be brought under the Tort Claims Act is far from clear. The present act does not waive federal immunity for damages for loss of il-

sue federal agents personally to obtain civil damages for violation of Fourth Amendment rights. Bivens v. Six Unknown Federal Narcotics Agents, *supra.* Unlike the suppression of evidence, such suits directly reach those who intentionally exceed their authority.

■ This court has held, Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 456 F.2d 1339 (2 Cir. 1972) on remand from the Supreme Court, that federal law enforcement agents are not immune from damage suits based upon allegations of violations of constitutional rights, even if acting within their powers. The plaintiff-victim in such an action must prove the allegations by a fair preponderance of the evidence; if he furnishes substantiating proof, the defendant-enforcement agent, to defend himself, must "allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted." *Bivens*, 456 F.2d at 1348.

The suppression order of the district court is set aside and the case is remanded for trial.

legally seized goods or for claims arising out of false imprisonment or arrest. 28 U.S.C. §§ 2680(c), (h); Blitz v. Boog, 328 F.2d 596 (2 Cir.), cert. den., 379 U.S. 855, 85 S. Ct. 106, 13 L.Ed.2d 58 (1964); Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388, 410, 91 S.Ct. 1999, 2012, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring) ("[T]he sovereign still remains immune to suit.").

On the other hand Congress intended the Government to be liable for trespasses, Dalehite v. United States, 346 U.S. 15, 45, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), and immunity exceptions are to be strictly construed. United States v. Muniz, 374 U.S. 150, 165–166, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); see also ABA Project on Standards for Criminal Justice, The Urban Police Function, § 5.5 (1973).

Connecticut has historically permitted victims of illegal searches to sue for trespass. Grumon v. Raymond, 1 Conn. 40 (1814), which means that federal enforcement officers who have over-stepped constitutional bounds could be sued in the state courts; but a suit against the United States government would probably be barred by federal immunity.

If the Tort Claims Act is amended to permit suits against the federal government for violations of the Fourth Amendment, it would assist in the handling of such civil suits if a procedure were developed pursuant to which a victim could file a civil petition or complaint to the same court that tried the criminal case out of which it arose, to be heard by the same judge, if possible, whose judgment could be based on the relevant evidence presented at the trial of the criminal case and any additional evidence the judge might call for or allow. As such actions would be heard and decided by the judge alone, the fear that juries would be reluctant to permit a victim, a defendant in the criminal prosecution, to recover at all, would be removed.