492 F.2d 1166
 UNITED STATES of America ex rel. Leon NEWSOME, Petitioner-Appellee,
v.
Benjamin J. MALCOLM, New York City Commissioner of
Correction, et al., Respondents, Louis J. Lefkowitz,
Attorney General of the State of New York,
Intervenor-Respondent-Appellant. Respondent-Appellant.
 No. 693, Docket 73-2413.
 United States Court of Appeals, Second Circuit.
 Argued Jan. 11, 1974.
Decided Jan. 28, 1974.
 
 Robert S. Hammer, Asst. Atty. Gen. of the State of New York (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen. on the brief), for intervenor-respondent-appellant.
 Stanley Neustadter, New York City (William J. Gallagher, The Legal Aid Society, New York City, on the brief), for petitioner-appellee.
 Before KAUFMAN, Chief Judge and SMITH and FEINBERG, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 This appeal presents the rare instance where by granting a writ of habeas corpus to a state prisoner we intrude less into local administration of criminal justice than if we were to follow the contrary course suggested by the state Attorney General. Judge Bruchhausen granted Leon Newsome's petition pursuant to 28 U.S.C. 2254 because the loitering statute under which Newsome was arrested has been declared unconstitutional by the New York Court of Appeals. Since Newsome is collaterally attacking a conviction not for loitering, but for a narcotics violation arising from evidence seized at the time of his arrest for loitering, his petition raises an interesting question of Fourth Amendment law. We agree with the New York Court of Appeals in its evaluation of the loitering statute and, because of the particular constitutional infirmities involved, are compelled to conclude that the writ should issue. We affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 The essential facts are not in dispute and can be related briefly. On February 12, 1970, New York City Housing Authority Policeman Warren J. Ungar and a fellow officer responded to an anonymous telephone call 'to the effect that someone was in the hallway' of a City Housing Authority dwelling at 81-03 Hammel Boulevard, Queens, New York. The patrolmen entered the building at approximately 10:20 p.m. and immediately approached two men-- Leon Newsome and an unidentified companion-- who were standing in the lobby near the main doorway. In response to Ungar's questions, Newsome said he had just entered the building. When Newsome was unable to produce identification, he was arrested for loitering (N.Y.Pen.L. 240.35(6), McKinney's Consol. Laws, c. 40) and searched incident to that arrest. Patrolman Ungar placed Newsome against the wall and 'went through the pockets.' This search produced a closed black leather pouch in which Ungar found a functional hypodermic instrument and a glassine envelope later determined to contain 2 grains of heroin. Accordingly, Newsome was also charged with possession of dangerous druge (N.Y.Pen.L. 220.05) and criminal possession of a hypodermic instrument (N.Y.Pen.L. 220.45).
 
 
 3
 After a brief nonjury trial before Criminal Court Judge Nicholas Tsoucalas on April 7, 1970, Newsome was convicted for loitering. Judge Tsoucalas immediately proceeded to conduct a hearing on Newsome's motion to suppress the evidence seized at the time of his arrest.[1] Newsome raised and Judge Tsoucalas rejected the same claims at trial and on the motion to suppress: that the patrolmen did not have probable cause to arrest Newsome for loitering and that the loitering statute was unconstitutional and could not therefore serve as the basis for searches incident to arrests.
 
 
 4
 On May 7, 1970, the date scheduled for a trial on the drug charges, Newsome appeared before Judge Abraham Roth and withdrew his prior pleas of not guilty and pleaded guilty to the lesser charge of 'attempted possession of dangerous drugs' (N.Y.Pen.L. 110.05(6)). He was sentenced immediately to 90 days in the City Reception Center, and received an unconditional release for the loitering conviction. The minutes of the May 7 proceedings clearly disclose Newsome's intention to appeal both the loitering conviction and, pursuant to N.Y.Code Crim.P. 813-c[2] the denial of his motion to suppress. Indeed, at the close of proceedings on May 7, Judge Roth granted a certificate of reasonable doubt (N.Y.Code Crim.P. 527) because 'there is a question of law involved here, very serious question of law, with regard to the loitering charge.' On direct appeal to the Appellate Term, the loitering conviction was reversed for insufficient evidence; but because the court found that probable cause existed to arrest Newsome for loitering, the search incident to that arrest was held valid and the drug conviction affirmed.[3] Leave to appeal to the New York Court of Appeals was denied and a petition for a writ of certiorari was denied sub nom. Newsome v. New York,405 U.S. 908, 92 S.Ct. 970, 30 L.Ed.2d 779 (1972). The instant petition for a writ of habeas corpus was filed on April 6, 1972,[4] just five days before Newsome was to begin serving his 90 day sentence (imposition of which had been stayed pending appeal).[5]
 
 
 5
 On July 2, 1973, prior to Judge Bruchhausen's final disposition on the merits, the New York Court of Appeals in a well-reasoned opinion declared 240.35(6) unconstitutional on its face because, among other infirmities, it was overly vague. People v. Berck, 32 N.Y.2d 567, 347 N.Y.S.2d 33, 300 N.E.2d 411 (1973), cert. denied sub nom. New York v. Berck, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973). On July 12, 1973, Judge Bruchhausen granted the writ.[6] The New York State Attorney General, who had not appeared in prior proceedings in this case, requested and was granted leave to intervene as a respondent on the present appeal.
 
 II. STANDING
 
 6
 As a threshold issue, the Attorney General raises the not unfamiliar claim that Newsome is without standing to pursue his underlying constitutional attacks on the drug conviction because those claims were waived when Newsome pleaded guilty. Ordinarily, it is true that an intelligent and voluntary guilty plea waives a defendant's right to trial and all claims of constitutional infirmities in the prosecution, which could have been raised at trial. Tollett v. Henderson, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973); McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).[7] But in McMann v. Richardson the Supreme Court noted that an exception to the general waiver rule exists where state law permits a defendant to retain his collateral claims after peading guilty. 397 U.S. at 766, 90 S.Ct. 1441. New York is one of those states which permit a defendant to appeal specified adverse pretrial rulings even though he subsequently pleads guilty. The operative statutory provision at the time Newsome pleaded guilty was N.Y.Code Crim.P. 813-c, which stated: 'the order denying (a motion to suppress) evidence may be reviewed on appeal from a judgment of conviction notwithstanding the fact that such judgment of conviction is predicated upon a plea of guilty.'
 
 
 7
 We have characterized the New York procedure as 'enlightened' for it permits a defendant whose sole defense is one of the specified constitutional claims neither to suffer nor impose on the state the burden of going to trial simply to preserve his claim-- a procedure which precipitated the enactment of 813-c.[8] See United States ex rel. Rogers v. Warden, 381 F.2d 209, 214 (2d Cir. 1967). This new procedural device manifested obvious legislative determinations that trials are not to be encouraged in order to preserve a ground for appeal and that guilty pleas in such cases would aid in avoiding additions to beleaguered trial calendars. Accordingly, the rule in this circuit is well established that a New York defendant who has utilized 813-c in the state courts may pursue his constitutional claim on a federal habeas corpus petition, for 'it would be anomalous if a defendant by scrupulously following a sanctioned and reasonable state procedure for preserving his federal constitutional claims on appeal in state courts, simultaneously waived his right to present these same claims to a federal court . . . because he was lulled into following state procedures.' Id. at 214-215. See United States ex rel. Stephen J. B. v. Shelly, 430 F.2d 215, 217 & n. 3 (2d Cir. 1970); United States ex rel. Molloy v. Follette, 391 F.2d 231 (2d Cir. 1968).
 
 
 8
 The Attorney General, despite our clear pronouncements on the issue, contends again, as he did in Molloy and Stephen J. B., that we should abandon the rule first announced in Rogers and close the avenue of federal habeas to state petitioners who have entered pleas of guilty under the circumstances we have recounted. Again, we reject this argument and reaffirm our view that where state law permits a defendant to plead guilty without forfeiting his appeals on collateral constitutional claims, it would be a trap to the unwary if a defendant who waived his right to trial in reliance on the state appeal procedures was thereafter precluded from pressing his federal constitutional claims in the district court. We believe, moreover, that were we to nullify the vitality of 813-c and similar statutes for federal habeas corpus purposes, most defendants with competent counsel would be dissuaded from pleading guilty and instead would proceed to trial for the sole purpose of preserving claims for potential vindication on state review or federal habeas. The New York legislature passed 813-c to prevent precisely this eventuality and federal courts should be reluctant to interfere with a state's administration of criminal justice, particularly when the result would be to add to its already congested criminal trial calendars. Accordingly, we refrain from confronting the state courts with a problem the legislature has attempted to ameliorate. We are of the view that the more appropriate forum for the Attorney General to express his dissatisfaction with 813-c is the state legislature, not the federal courts.
 
 
 9
 As a final attack on our Rogers-Molloy-Stephen J. B. line of cases, the Attorney General contends that Tollett v. Henderson, supra, precludes all state prisoners who pleaded guilty from asserting collateral constitutional claims in federal habeas petitions-- notwithstanding state procedures which allow the defendant to retain those claims for purposes of state post-conviction remedies. In our view, Tollett does not stand for this proposition. In Tollett a Tennessee prisoner attacked his 25-year-old conviction (entered after a guilty plea) for first degree murder on the ground that blacks were systematically excluded from the grand jury that indicted him. Tennessee had no procedure analogous to 813-c for preserving constitutional claims after pleading guilty. The supreme Court held that:
 
 
 10
 after a criminal defendant pleads guilty, on the advice of counsel, he is not automatically entitled to federal collateral relief on proof that the indicting grand jury was unconstitutionally selected. The focus of federal habeas inquiry is the nature of the advice and voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity.
 
 
 11
 411 U.S. at 266, 93 S.Ct. at 1607. To be sure, Tollett did not mention the exception cut out in McMann, and to which we have referred, for states which provide for the preservation of constitutional claims, but given the absence of this type of provision in Tennessee law, that question was not before the court in Tollett and repetition of the principle would have been superfluous. Accordingly, we refuse to undertake the hazardous task of elevating silence to the level of stare decisis.[9] When, as here, a defendant enters a plea of guilty and then follows acknowledged state procedures for preserving his claims, the guilty plea does not act as an automatic waiver.
 
 
 12
 III. CONSTITUTIONALITY OF NEW YORK'S LOITERING STATUTE
 
 Section 240.35(6) provides:
 
 13
 A person is guilty of loitering when he: . . . Loiters, remains or wanders in or about a place without apparent reason and under circumstances which justify suspicion that he may be engaged or about to engage in crime, and, upon inquiry by a peace officer, refuses to identify himself or fails to give a reasonable credible account of his conduct and purposes . . ..
 
 
 14
 We have noted that the New York Court of Appeals has already declared this provision unconstitutional on its face. People v. Berck, supra. In the instant proceeding, the Attorney General urges us, in effect, to instruct the state's highest court that its evaluation of a state statute was erroneous. Since the state court grounded its decision on the federal rather than the state Constitution, we must make an independent determination of the applicable federal standards. See Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Accordingly, the question before us on this application for federal habeas corpus relief is whether the section violates due process. We conclude that it does.
 
 
 15
 When 240.35(6) became effective on September 1, 1967, it represented New York's formulation of a dragnet approach to the maintenance of public order that had its roots in feudal England and which has survived, despite considerable disapproval, in urban America. Originally conceived as a method to keep unemployed laborers from wandering between towns and terrorizing travelers, laws against vagrancy and loitering have been transformed into devices for preventing crime and for removing so-called nuisances-- mobs and individual 'undesirables'-- from public places.[10] Despite the obvious governmental interest in preserving public order, a vagrancy-loitering statute will run afoul of the Constitution when its necessarily broad scope is stated in language so indefinite that it fails to:
 
 
 16
 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989, and because it encourages arbitrary and erratic arrests and convictions. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066.
 
 
 17
 Papachristou v. Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Moreover, because the crime prevention components of loitering statutes are aimed at suspected or potential rather than incipient or observable conduct, they may conflict with the deeply rooted Fourth Amendment requirement that arrests must be predicated on probable cause, Beck v. Ohio, 379 U.S. 89, 85 S.Ct 223, 13 L.Ed.2d 142 (1964); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). See Papachristou v. Jacksonville, supra; Palmer v. Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971). Indeed, it has been suggested that:
 
 
 18
 because the elements of the . . . offense are obscure, even officers engaged in its good faith effectuation cannot gauge justification for . . . arrests consistently with Fourth Amendment principles.
 
 
 19
 Hall v. United States, 148 U.S.App.D.C. 42, 459 F.2d 831, 837 (1972) (en banc).
 
 
 20
 Turning from our brief discussion of the history and purposes of vagrancy legislation to the specific statute in issue, we must scrutinize the New York statute in accordance with the standard enunciated in Papachristou, Palmer, and Smith v. Florida, 405 U.S. 172, 92 S.Ct. 848, 31 L.Ed.2d 122 (1972). Under the first prong of the vagueness test (Papachristou v. Jacksonville, supra, 405 U.S. at 162, 92 S.Ct. 839, quoting, United States v. Harriss, supra, 347 U.S. at 617, 74 S.Ct. 808) we must determine whether the statute's prohibitions are cast in terms sufficiently precise to give a reasonably intelligent person notice of the conduct that is proscribed. See Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). Newsome contends that the operative language is so indefinite that even a citizen who had 'read and studied' the statute in an effort to regulate his behavior would be in a quandary. He suggests, moreover, that the linguistic imprecision is exacerbated because 240.35(6) imposes criminal liability in the absence of criminal intent, a factor noted by the Supreme Court in Papachristou. 405 U.S. at 162, 92 S.Ct. 839. It is urged, therefore, that the elements of loitering may be established by suspicious circumstances of which a citizen may not be cognizant and for which he may bear no responsibility. The Attorney General asserts, on the other hand, that 240.35(6) can be distinguished from the statutes disapproved in Papachristou, Palmer, and Smith, because it 'focuses upon specifically criminal conduct.'
 
 
 21
 On its face, the statute discloses that 'loiter(ing)' 'remain(ing)' or 'wander(ing)' in an unspecified place for an unspecified period of time without apparent reason can establish the first element of the offense. Surely a citizen who sought to conform his conduct to this provision would be unable to discern whether he risked criminal responsibility by taking a leisurely stroll, by sitting briefly on a park bench, or by seeking shelter from the elements in the doorway of a building.
 
 
 22
 The second substantive component of the statute is established by 'circumstances which justify suspicion that (a person) may be engaged or about to engage in crime.'[11] Yet, such 'circumstances' may reflect the 'whim of the policeman,' People v. berck, supra, 347 N.Y.S.2d at 38, 300 N.E.2d at 414, rather than the conduct of an individual who happened to 'wander' into the midst of the police, thereby creating the 'hazard of being prosecuted for knowing but guiltless behavior.' Baggett v. Bullitt, 377 U.S. 360, 373, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964). With nothing more, the 'suspect' is hardly offered a bright line test for distinguishing the licit from the illicit.
 
 
 23
 Moreover, there are insufficient guidelines for enforcement and thus 240.35(6) does not pass constitutional muster on this ground as well. The section permits arrests and convictions for suspicion or for possible crime based on circumstances less compelling than the reasonable and articulable factors which are required to sustain a mere on-the-scene frisk. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). It has been noted, and we agree, that the section could lend itself to the abuse of pretextual arrests of people who are members of unpopular groups or who are merely suspected of engaging in other crimes, without sufficient probable cause to arrest for the underlying crime.[12] For example, in People v. Williams, 55 Misc.2d 774, 286 N.Y.S.2d 575 (New York City Crim.Ct.1967), the court commented that:
 
 
 24
 these defendants are 41 of a group of alleged prostitutes who have been arrested and detained 2500 times for disorderly conduct and loitering in New York City since August 18th . . .. This Court of its own knowledge is aware that except for a few isolated instances where defendants pleaded guilty, the disorderly conduct cases were dismissed. In many instances, 'the girls' were arrested after 11:30 P.M., too late to be arraigned, night court had been adjourned, then kept overnight in a cell. In the morning they were brought to Court and released because the offenses for which they had been arrested could not be proven to have been committed by them.
 
 
 25
 286 N.Y.S.2d at 577. See Amsterdam, Federal Constitutional Restrictions on the Punishment of Crimes of Status, Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like, 3 Crim.L.Bull. 205, 220-28 (1967); Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1, 8 (1960); Lacey, Vagrancy and Other Crimes of Personal Condition, 66 Harv.L.Rev. 1203, 1219-24 (1953). See also Winters v. New York, 333 U.S. 507, 540, 68 S.Ct. 665, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting).
 
 
 26
 To the extent the statute can be interpreted to support dragnet, streetsweeping operations absent probable cause of actual criminality, it conflicts with established notions of due process. Beck v. Ohio, supra; Henry v. United States, supra; Wong Sun v. United States, 371 U.S. 471, 479-482, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Even in the absence of purposeful circumvention of traditional standards for lawful arrests, 240.35(6) confers discretion that is simply too unbridled to satisfy due process standards. The 'infirmity' lies in the imprecision of the statute, not the subjective intent of enforcement officials. The Supreme Court has noted, 'well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law.' Baggett v. Bullitt, supra, 377 U.S. at 373, 84 S.Ct. at 1323.[13]
 
 
 27
 Applying the standards enunciated in Papachristou, Palmer, and Smith, we conclude, as did the New York Court of Appeals in Berck, that 240.35(6) contravenes the Due Process Clause of the Fourteenth Amendment not only because it fails to specify adequately the conduct it proscribes, but also because it fails to provide sufficiently clear guidance for police, prosecutors, and the courts so that they can enforce the statute in a manner that is consistent with the Fourth Amendment. Accordingly, Newsome's arrest pursuant to that section was unlawful.
 
 IV. SEARCH INCIDENT TO ARREST
 
 28
 Having concluded that Newsome's arrest pursuant to an unconstitutional statute was unlawful, we turn our attention to whether the search conducted incident to that arrest was also unlawful. For the reasons set forth, we conclude that the search in this case was constitutionally invalid, that the evidence thus seized must be suppressed and that, accordingly, the writ should issue.
 
 
 29
 Searches incident to arrest comprise a well-recognized exception to the warrant requirement of the Fourth Amendment. This exception, of course, does not reduce the level of constitutional protection because it retains the safeguard that probable cause must exist to justify the intrusiveness of the underlying arrest. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). Indeed, in recently expanding the permissible scope of searches incident to lawful arrests, the Supreme Court placed great reliance on the existence of probable cause to arrest as a justification for its holding. United States v. Robinson, supra, 414 U.S. at 235, 94 S.Ct. 467; Gustafson v. Florida, supra, 414 U.S. at 265, 94 S.Ct. 488.
 
 
 30
 Newsome, however, was searched incident to arrest for the violation of a statute which we have found unconstitutional in the main because it substituted mere suspicion for probable cause as the basis for arrest. Thus, we consider his warrantless search constitutionally defective because to sustain its validity would emasculate the essential Fourth Amendment protection which only probable cause provides.[14] Accordingly, we affirm.
 
 
 
 [1]
 Patrolman Ungar was the only witness at the loitering trial and the suppression hearing
 
 
 [2]
 Presently codified as N.Y.Crim.Proc.L. 710.70(2)
 
 
 [3]
 The Appellate Term disposed of Newsome's appeal by issuing a summary order which is silent on the constitutional claims
 
 
 [4]
 Although Newsome has not pursued state avenues of collateral attack, his federal claims were presented to the state courts on direct appeal. He has, therefore, satisfied the exhaustion requirement, Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), and the state makes no claim to the contrary
 
 
 [5]
 On May 23, 1972, Judge Bruchhausen dismissed the petition because Newsome was not 'in custody' as required by 28 U.S.C. 2241. On appeal, we remanded by summary order (April 26, 1973) (72-1875) for a disposition on the merits, in light of the Supreme Court's holding on the custody question in Hensley v. Municipal Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973)
 
 
 [6]
 Apparently because of a clerical error, Judge Bruchhausen's memorandum and order incorrectly indicate that Newsome is attacking a conviction for loitering. As noted above, the loitering conviction was vacated by the Appellate Term and the instant petition attacks the drug conviction
 
 
 [7]
 After a defendant pleads guilty on advice of counsel, 'the focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity.' Tollett v. Henderson, supra, 411 U.S. at 266, 93 S.Ct. at 1608
 
 
 [8]
 A companion section, 813-g (presently codified as N.Y.Crim.Proc.L. 710.20(3), 710.70(2)) permitted similar appeal from the denial of a motion to suppress an allegedly coerced confession
 
 
 [9]
 A split panel of the Ninth Circuit has apparently concluded that the exception noted in McMann has not survived Tollett. Nann v. Smith, 488 F.2d 245 (9th Cir. 1973) petition for cert. pending U.S. , 94 S.Ct. 1445, 39 L.Ed.2d 490 (1973). The language to this effect in the Mann majority opinion must be considered dicta, however, since the petitioner had not in fact availed himself of state post-plea appellate procedures. Mann, supra, at 247 n. 1. The court commented that the failure to appeal in state court coupled with an apparent plea bargain was 'more consistent with a relinquishment of his Fourth Amendment claims than an attempt to preserve them.' Id. Although we do not agree with the Ninth Circuit's reading of Tollett's impact on McMann, our holding is not inconsistent with the determination that a defendant who fails to invoke available state procedures will not automatically benefit on federal habeas from the mere existence of those procedures
 
 
 [10]
 See generally Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1 (1960); Foote, Vagrancy-Type Law and Its Administration, 104 U.Pa.L.Rev. 603 (1956); Lacey, Vagrancy and Other Crimes of Personal Condition, 66 Harv.L.Rev. 1203 (1953)
 
 
 [11]
 As construed by the New York courts, the third condition of 240.35(6) ('upon inquiry . . . defendant refuses to identify himself or fails to give a reasonably credible account of his conduct and purposes') is not in fact a substantive element of the crime of loitering. Rather, the police inquiry is a 'procedural condition' to arrest under the statute. People v. Schanbarger, 24 N.Y.2d 288, 291-292, 300 N.Y.S.2d 100, 101-102, 248 N.E.2d 16, 17 (1969). See People v. Berck, supra, 347 N.Y.S.2d at 36 n. 2, 300 N.E.2d at 413
 
 
 [12]
 We note, however, that there is no suggestion that Newsome was the target of a pretextual arrest and search, or that the officers failed to act in good faith
 
 
 [13]
 The defects which we find in 240.35(6), and which were discussed by the New York Court of Appeals in Berck, are neither obscure nor manifestations of recent shifts in the law. The commentary accompanying 240.35(6) in the New York Penal Law indicates that the subdivision was a new and 'controversial' amendment. Subdivision 6 created a catch-all category to supplement other loitering provisions which specify with greater precision the conduct they proscribe. See N.Y.Pen.L. 240.35. The court in Berck commented that subdivision 6 was patterned after 250.12 of Tentative Draft 13 of the Model Penal Code. The american Law Institute abandoned that formulation, however, in its Proposed Official Draft precisely because the vagueness of the tentative draft was subject to the abuse of arrest and searches without probable cause. ALI, Model Penal Code, 250.6, Proposed Official Draft at 227 (1962)
 Even before the New York Court of Appeals struck down 240.35(6), the lower state courts had experienced difficulty in interpreting the statute in a consistent manner to ensure even-handed enforcement. Three lower courts had declared 240.35(6) unconstitutional (People v. Bambino, 69 Misc.2d 387, 329 N.Y.S.2d 922 (Nassau County Ct.1972); People v. Villanueva, 65 Misc.2d 484, 318 N.Y.S.2d 167 (Long Beach City Ct.1971); People v. Beltrand, 63 Misc.2d 1041, 314 N.Y.S.2d 276 (New York City Crim.Ct.) aff'd on other grounds, 67 Misc.2d 324, 324 N.Y.S.2d 477 (App.Term 1971)); two had upheld the statute in the face of constitutional challenges (People v. Taggart, 66 Misc.2d 344, 320 N.Y.S.2d 671 (Suffolk Dist.Ct.1971); People v. Strauss, 66 Misc.2d 268, 320 N.Y.S.2d 628 (Nassau Dist.Ct.1971)); and one court has expressed doubts over its constitutionality although it did not reach the ultimate question (People v. Williams, 55 Misc.2d 774, 286 N.Y.S.2d 575 (New York City Crim.Ct.1967).
 
 
 [14]
 We disclaim any intention to fashion a per se principle that all searches incident to arrests under statutes later declared unconstitutional are invalid