**UNITED STATES of America ex rel. Joseph POWELL, Petitioner,**

v.

**J. E. LaVALLEE, Superintendent, Clinton Correctional Facility, Respondent.**

**No. 74 Civ. 471.**

United States District Court,
S. D. New York.

June 6, 1974.

Joseph Powell, pro se.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, by Arlene R. Silverman, Asst. Atty. Gen., for respondent.

## MEMORANDUM

BONSAL, District Judge.

Petitioner, *pro se,* seeks a writ of habeas corpus.

Petitioner was arrested on January 23, 1970 in a police raid on apartment 3H at 1874 Loring Place, Bronx, New York. Seized by the police at that time were some 10 pounds of heroin and paraphernalia for "bagging up" heroin. Prior to his trial, petitioner moved to suppress this evidence on the grounds that it was illegally seized. After a hearing before Justice Brust of the New York Supreme Court, Bronx County, petitioner's motion was granted on June 18, 1970. The State took an interlocutory appeal, and on March 25, 1971, the order of the trial court suppressing the evidence was reversed by the Appellate Division, First Department. 36 A.D.2d 177, 319 N.Y.S.2d 485 (1971) (Nunez & Capozzoli, JJ., dissenting). The New York Court of Appeals affirmed on March 16, 1972. 30 N.Y.2d 634, 331 N.Y.S.2d 445, 282 N.E.2d 333 (1972) (Fuld, C. J., dissenting).

On October 19, 1972, petitioner pled guilty to the charge of criminal possession of a dangerous drug in the first degree and was sentenced to imprisonment for a term of 8⅓ to 25 years. Petitioner is presently serving his sentence in the Clinton Correctional Facility, Dannemora, New York. By way of habeas corpus, petitioner now asks this Court to pass on the constitutionality of the seizure of evidence which occurred incident to his arrest on January 23, 1970. In view of the ample record in the State court proceedings in which petitioner was represented by counsel, no hearing is necessary.

*Facts*

Petitioner's arrest on January 23, 1970 was the culmination of an investigation which began some three months earlier. On October 24, 1969 an unknown informant telephoned the Narcotics Bureau office and provided the names and addresses of four women, two of whom were said to be running narcotics mills. These women were Beverly Massey, nicknamed Chalky, Jr., and Naomi Bostick, nicknamed Chalky, living at 866 Elsmere Place, apartment 2E, and Robbie Taylor and Marcelle Thomas, living at 90 West 164th Street, apartment 6A. As a result of the anonymous phone call, surveillance of these two locations was begun. Inspection of the Bureau of Identification records revealed that both Massey and Bostick had previously been arrested and convicted of violations of the narcotics laws.

On October 29, 1969, Bostick was followed from 866 Elsmere Place to the vicinity of 173rd Street and Walton Avenue, where she met a man named Charles Harris. Together, Bostick and Harris proceeded to 1764 Walton Avenue, apartment 3G. Apartment 3G was kept under surveillance, during which time one of the police officers overheard conversation in which the name "Chalky", Bostick's nickname, was used. At about 10 p. m. the door to apartment 3G opened. Bostick emerged carrying a large number of glassine envelopes and was arrested. Inside apartment 3G, one of the officers saw white powder, glassine envelopes, rubber bands, and scotch tape. In addition to Bostick, three other persons—Charles Harris, Claudette Gary and Pat Jackson—were arrested. While at the station house, Jackson asked one of the officers if he would give Naomi and Beverly a break be-

cause, " 'These girls just work mills. They are just working girls.' "

On January 5, 1970 surveillance on Massey, Bostick and 866 Elsmere Place was resumed. That same day officer Strano, one of the officers involved in the investigation, requested information about Massey and Bostick from a confidential informant. On a past occasion this informant had given information which led to the arrest of three persons for violation of the narcotics laws. The informant stated that he believed Massey and Bostick to be two girls who stayed at a bar on 116th Street and Fifth Avenue, that they were known by the name of Chalky and that they and their friends dressed in men's clothes. On the following day, the informant identified pictures of Massey and Bostick and stated that there was little doubt that they were active in "bag-ups" or in mills.

On January 14, 1970, the informant told Strano that "something was happening," that "something was in the wind," and that "[t]he girls were getting ready." The following day the informant told Strano that "it wouldn't be a big one but it might be going down, and very possibly at 866 Elsmere." On January 16, the police officers waited at 866 Elsmere Place from early morning until about 6:00 p. m. Strano spoke to the informant by phone and was told, " 'It is off. I don't know what happened but all the girls are out in the street.' "

On January 20, 1970 Strano spoke to the informant again. The informant told him that "they were ready again," that "there was a lot of confusion," that "there would be a lot of girls involved" and that it would not be at the usual place. The informant said he would try to ascertain the location.

On January 21, 1970, Strano and another officer followed Massey from Elsmere Place to the corner of Loring Place and Burnside Avenue, where she entered a building. That evening, the informant told Strano that " 'It is really hot. It is going. The girls are moving. They are all happy. They are going to make money.' " Strano asked the informant what he knew about " 'Loring Place and Burnside.' " The informant hesitated and asked, " 'Big corner building?' ", to which Strano replied, " 'Right'." The informant then said " 'There is a girl that lives in there, they call Tess, but she has a lot of nicknames and she is involved in all kinds of games.' " He also stated that the apartment had been used before and that it was on the third floor.

On January 22, 1970, Strano spoke to the informant for the last time prior to the arrest. The informant told him, " 'Everything is go. They are all ready. It is going to start early in the morning. It is going to be a big one. Be careful and good luck.' " The informant also confirmed the address and the apartment again. Officer Strano went to the District Attorney's office and obtained a "no knock" search warrant. Prior to the raid on January 23, one of the officers learned from the name on the doorbell and through verification by the phone company that the occupant of apartment 3H was Tessie Truehart.

Early on January 23, 1970, police officers took up positions at 866 Elsmere Place and 1874 Loring Place. At about 7:45 a. m., a woman, later identified as Ann Brown, was observed entering 1874 Loring Place. At 8:00 a. m. a Buick with New Jersey registration came up Burnside Avenue and parked on the corner of Burnside and Loring, on the opposite side of the street from 1874 Loring Place. A man, later identified as the petitioner, got out of the driver's side of the car, walked to the rear of the vehicle, and stood there for three to five minutes looking up and down the street. At approximately 8:05 Massey emerged from 1874 Loring Place, approached petitioner and engaged him in conversation. After both petitioner and Massey looked around the street again, petitioner opened the trunk of the car and removed a cardboard box, a paper bag, and a valise. Petitioner and Massey then carried these items into 1874 Loring

Place. Officer Strano testified that "as is usual in a mill case, when a man pulls up, he was met by one girl who usually runs the mill."

At approximately 8:30 a. m. officers stationed at 866 Elsmere Place observed Bostick leave that address in the company of another woman and get into a cab. These officers phoned the officers at 1874 Loring Place to be on the lookout for Bostick and then proceeded to 1874 Loring Place themselves. While positioned at Loring Place, police officers observed numerous women enter 1874 Loring Place between 9:00 a. m. and 10:30 a. m., some of whom they recognized from previous surveillance and some of whom appeared to be dressed in men's clothing. Two women were directly observed entering apartment 3H. One of the officers who entered the building "heard a lot of female voices in apartment 3H." At about 10:30 a. m. Bostick appeared on West Burnside and Loring Place carrying two shopping bags of food. After being joined by another woman, Bostick entered 1874 Loring Place.

At about 12:30 p. m. the police officers entered 1874 Loring Place. One of them overheard someone in 3H say, " 'Hey Chalky' " and a short time later heard a female voice say " 'Hey Beverly, is the food ready?'."

At about 1:00 p. m., four officers proceeded down the fire escape to the bedroom window of apartment 3H, while three other officers waited in the hallway outside the apartment. Weapons drawn, the four officers climbed through the bedroom window and proceeded to the living room where they observed two men and some thirteen women around a table. On the table, in front of some of the women, were small piles of white powder, and at the end of the table near the two men were two plastic bags containing white powder. Also on the table were boxes of glassine envelopes, scotch tape, and rubber bands. The officers observed the women placing white powder into the glassine enve-

lopes, sealing them, and then placing the glassine envelopes into bundles with rubber bands. The men were at the same time mixing some white powder. Two of the officers testified at the suppression hearing that in their opinion the people in apartment 3H were engaged in operating a narcotics mill. The officers in the hall were let into the apartment; the people in apartment 3H were arrested; and the white powder and other items on the table were seized.

*Effect of Petitioner's Guilty Plea*

■ At the outset, we must determine whether the petitioner by entering a plea of guilty in the State court is now precluded from asserting by way of habeas corpus the unconstitutionality of the seizure of evidence. In recently addressing this issue, the Court of Appeals stated that "where state law permits a defendant to plead guilty without forfeiting his appeals on collateral constitutional claims, it would be a trap to the unwary if a defendant who waived his right to trial in reliance on the state appeal procedures was thereafter precluded from pressing his federal constitutional claims in the district court." United States ex rel. Newsome v. Malcolm, 492 F.2d 1166, 1170 (2d Cir. 1974). Relevant here is N.Y. Criminal Procedure Law § 710.70(2) (McKinney's Consol. Laws 1971, c. 11–A), which provides:

> "An order finally denying a motion to suppress evidence may be reviewed upon an appeal from an ensuing judgment of conviction notwithstanding the fact that such judgment is entered upon a plea of guilty."

In the present case, petitioner's motion to suppress evidence was granted by the trial court. However, on appeal by the State, the Appellate Division reversed the trial court and was affirmed by the Court of Appeals. It was after the affirmance by the Court of Appeals, but before his petition for habeas corpus that petitioner pled guilty to the charge of criminal possession of a dangerous drug in the first degree. Petitioner al-

leges that at the time of sentencing he made clear his intention to pursue his constitutional claims in federal court, relying on N.Y. Criminal Procedure Law § 710.70(2).

Although petitioner pled guilty after appeal on his constitutional claims was completed in the State courts, a procedural posture which differs from that in *Newsome, supra,* the rule of *Newsome* seems applicable. Here as in *Newsome,* it would be an unwarranted interference with New York State's administration of justice to dissuade defendants from pleading guilty and encourage them to proceed to trial simply to preserve their constitutional claims for purposes of habeas corpus relief, a situation which the New York Legislature has sought to alleviate through N.Y. Criminal Procedure Law § 710.70(2). Accordingly, petitioner's plea of guilty does not preclude him from seeking habeas corpus relief in this Court.

During the suppression proceedings before Justice Brust, the District Attorney conceded that the search warrant obtained on the day before the raid was void by reason of the insufficiency of the supporting affidavit. However, in the State appellate courts, the District Attorney was successful in sustaining the warrantless seizure of evidence on January 23, 1970 on the theory that the seizure was incident to a lawful arrest. The issues now confronting this Court, therefore, are whether petitioner's arrest was based on probable cause, *see* Mayer v. Moeykens, 494 F.2d 855 (2d Cir. March 27, 1974), and whether the entry of the police officers into apartment 3H to effect that arrest otherwise violated petitioner's Fourth Amendment rights. For the reasons hereinafter discussed petitioner's application for a writ of habeas corpus is denied.

*Probable Cause*

■■ In determining whether petitioner's arrest was based on probable cause, this Court must focus on " 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information' " when at approximately 1:00 p. m. on January 23, 1970 they raided apartment 3H at 1874 Loring Place and arrested the petitioner and others. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). The combination of an informer's tip and corroborative evidence obtained by police investigation may be sufficient to establish probable cause, even though each alone would not. Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Canieso, 470 F.2d 1224 (2d Cir. 1972); United States v. Manning, 448 F.2d 997 (2d Cir. 1971) (en banc decision).

During the course of their three-month investigation, the Narcotics Bureau officers had been told by at least three different sources that Massey and Bostick were active in narcotics traffic. Both had arrest and conviction records for narcotics violations. Indeed, as a result of the surveillance on 866 Elsmere Place, Bostick was arrested on October 29, 1970 emerging from an apartment in possession of heroin-filled glassine envelopes after apparently engaging in milling the heroin.

On January 5, 1970, Officer Strano requested one of his confidential informants to assist him in the investigation. That informant told Strano that Massey and Bostick both used the nickname Chalky, that they and their friends dressed in men's clothing, and that Massey and Bostick were active in "bag-ups" or in mills. The informant recognized the Loring Place building and also stated that a girl lived there called Tess, that her apartment was on the third floor and that it had been used before. Finally, on January 22, the informant told Strano that a narcotics mill would start early in the morning on January 23, 1970 in apartment 3H at 1874 Lor-

ing Place. In corroboration of the informant, police investigation revealed that the occupant of apartment 3H was Tessie Truehart.

■ Further corroboration of the informant's tip was developed by police investigation on the morning of January 23 at the time and place stated by the informant. At 7:45 a. m. a woman was observed entering 1874 Loring Place. At 8:00 a. m. a car parked near the Loring Place building. The petitioner emerged, walked to the rear of the car, and stood there suspiciously looking up and down the street. Some five minutes later, Massey, who was known to the police, emerged from 1874 Loring Place, approached petitioner, and engaged him in conversation. After both petitioner and Massey looked around, petitioner opened the trunk of the car and took out a cardboard box, a paper bag, and a valise. He and Massey then carried these items into 1874 Loring Place. A meeting between the girl running the mill and the person bringing the drugs was a pattern which these experienced police officers recognized in mill cases. Then significantly, during the next couple of hours, numerous women, some of whom were known to the police as associates of Massey and Bostick, and some of whom were wearing men's clothing entered 1874 Loring Place. Two were directly seen entering apartment 3H. Bostick herself left 866 Elsmere Place and arrived at Loring· Place. Prior to the raid, the police overheard "a lot of female voices" in apartment 3H, overheard someone use the nickname Chalky, and overheard a female voice call out to "Beverly." All of these events corroborated the informant's tip and together with that tip were sufficient to establish probable cause for believing that a narcotics mill was operating in apartment 3H at 1874 Loring Place at 1:00 p. m. on January 23, 1970.

*Entry*

In spite of the existence of probable cause, this Court would still have to grant petitioner's application for a writ of habeas corpus if the manner by which the officers entered apartment 3H violated petitioner's rights under the Fourth Amendment. Since the District Attorney conceded that the "no knock" warrant obtained by the officers on January 22, 1970 was void, the entry here involved must be sustained, if at all, as a warrantless entry. *Cf. Whiteley, supra;* Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, rehearing denied, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971).

■ Warrantless, unannounced entry through a bedroom window was sustained in the State appellate courts on the basis of "exigent circumstances." The presence of "exigent circumstances" has been recognized as an exception to any possible rule embodied in the Fourth Amendment that police entry into a dwelling must be announced. *See* Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); United States v. Artieri, 491 F.2d 440 (2d Cir. 1974); United States v. Manning, *supra.*

■ At the time of their entry into apartment 3H, the police officers were presented with a situation involving a large number of people, the possibility of destruction of evidence, *cf. Ker, supra* 374 U.S. at 40, 83 S.Ct. 1623, and considerable risk to their physical safety.* *Cf. Sabbath, supra,* 391 U.S. at 591, 88 S. Ct. 1755; *Artieri, supra* 491 F.2d at 444. In view of these exigent circumstances, the unannounced entry of the officers did not violate the petitioner's rights under the Fourth Amendment.

---

* Officer Roche testified at the suppression hearing that "[t]he people who run mills usually pack guns to protect the mills so they don't get taken off by outsiders, not by police officers."

Petition for writ of habeas corpus is denied. However, in view of the important constitutional questions presented, leave to appeal in forma pauperis and for a certificate of probable cause is granted.

It is so ordered.